for the appellate Stephen Hedinger and for the aptly James Brandenburg. Mr. Hedinger, proceed. Thank you, your honor. May it please the court. I'm Stephen Hedinger. I'm representing the appellant today. We're here today seeking this court's reversal of the trial judge's denial of my client's post-trial motion for sanctions. My client Patrick O'Keefe had brought an action in the circuit court for replevy of his dog and for damages for the wrongful taking of that and keeping of that dog. And summary judgment was granted in my client's favor on the issue after the trial judge had already granted the preliminary replevin order in favor of my client. The trial on damages was resulted in a verdict for the defendant following which we filed our motion for sanctions basically on the basis that the entire defense and the counterclaim filed by the defendant, particularly Andrew Hagan, but it was shared in by the other defendants as well, was lacking in any merit, both legally or factually. We've tried to... How do you explain the jury verdict? The jury verdict was based upon and actually it was consistent with the argument here. I provided the court with some excerpts from closing argument and trial testimony. It was actually the defendant's position before the jury that they didn't want the dog, that somehow my client had not taken advantage of opportunities to get the dog back. The jury believed that even in the face of the fact that there was a counterclaim filed saying just the complete opposite and apparently believed Mr. Reese's assertion that, well, we just didn't have any intention to pursue that, we just wanted to ring his bell. So in a sense, those, well I say in a very strong sense, those by losing on the possession issue and on the replevin issue opened the door for the defendants to drive straight through with this defense on the damages portion. The damages portion was, you know, I've been practicing long enough to know that no jury in central Illinois was going to award my client very much damages, if any, for not having a dog for a while. So it wasn't really a surprise to me that the jury would say, well, you got your dog back, what more do you want? You know, everybody go your own way. Timing wise, in fact, if we had had the summary judgment and the dismissal of the case and we were literally in the court's chambers waiting to pick the jury, I might have said, well, let's just drop the remainder of this case and not even bother with the jury trial on damages. But timing wise, I had all my witnesses there, we were there, so we went forward with that trial. We never should have reached that point. The defense in this case was based upon the premise that there was some sort of evidence to support a legal position of abandonment of the dog. Abandonment certainly is theoretically a viable defense or, in terms of the counterclaim, a basis for obtaining ownership. But under Illinois law, that can only be found if there is a claim to be made. I don't think that's unique to Illinois. I think probably most states have that same requirement, that there has to be some showing of an intention to get rid of the personal property at issue. And in this case... Let me just ask you something here. You were saying if something had happened at a certain point, you might just have dropped the remaining case. The dog was returned to you in March of 2010. In April, you filed an amended complaint. Then in November, you filed a motion for partial summary judgment. The case... You had the dog back for a long time while you were still filing all this stuff, didn't you? That was under the preliminary possessory order for the replevin, Your Honor. That was not a final decision of possession. As a matter of fact, the statute as I read it requires me to press forward with that on pain of possibly abandoning the replevin goods if I don't prosecute to the conclusion of the case as quickly as possible. So yes, all those things did happen, but I couldn't just drop it at that point. We needed to press forward. What really should have happened is at that point, and I had requested this of Mr. Reese and his clients even before he became involved on several occasions, would you just please drop your claim to the possession or ownership of this dog so that we can then decide whether I have any case for damages or not. There's a series of letters that are included in the materials. August 3, 2009 clear up to September 13, 2010 when I urged Mr. Reese and his clients to just drop that claim so that we can determine whether there's anything left of damages. And in those letters, I specifically informed Mr. Reese that I understand that if you give me the dog back and drop your claim to ownership so that that issue is out of the case that I will have little if any remaining claim for damages. So please do that for your own benefit as well as mine. And for the most part, those letters were completely ignored and unanswered. We did receive one response from Mr. Reese on August 4, 2010 that basically said that it was my position concerning the possession and ownership of the dog that was frivolous, not his, and that he would seek sanctions against me. So I'm not sure what more I could have done. Believe me, I've thought about it. You know, looking back on it, I could have just let them keep the dog. That was never something that I was willing to do. There was testimony from the police chief that Andrew had offered to return the dog in exchange for payment of the dog's expenses. Is that correct? The numbers that came out at trial were from $200 to $600 and we'll give the dog back. My client testified that he did, in fact, agree to pay those and before that happened at that initial meeting of everyone, they just decided they wouldn't give the dog to him and he needed to sue them in order to get the dog back. If you look at my letter of August 20, no, August 3, however, we made an unequivocal offer to pay whatever cost they had if they would just return the dog and that was before the lawsuit was filed. You can find that letter, it's in the record at C905 and in the appendix at 187. Beyond short of that, the first offer that was made to just return the dog, we'll give you the dog back, it was directed directly to me. We were actually sitting in the courtroom or in the hallway outside Judge Londrigan's chambers on that. It was actually the second scheduled replevant hearing date that Mr. Reese, for the first time, had entered his list of numbers and he said, if you pay this and drop any claim for damages, you can have the dog back. Well, we were on our way into the courtroom at that point. I had all my witnesses there to get the dog replevied so I said, no, we'll get this order and then we can talk. But instead he went in and got a change of judge and that required another continuance and beyond that. That was the only time that was directed directly to me an offer to pay those expenses and get the dog back. So if they had some basis to say that there was an abandonment, then they could have had a claim and that's why we had to follow through with all of the litigation in order to knock out the ten witnesses that they'd named as having relevant information on the abandonment. I kept waiting for that witness or that piece of evidence that my client had said to someone, I don't want my dog back or that he had actually run the dog off when the dog wandered off in June of 2009, anything like that, but we never received it. Instead, the only evidence we ever got was, well, we don't think you took good enough care of the dog or prior to this occasion the dog had gotten loose previously. Was the only issue the replevant? Whether you got the dog back? Is the only issue? Well, the other issue... You started out and sued the city of Girard, didn't you? I did, Your Honor, and as a matter of fact, there's a Section 1983 action pending in the Central District. That has to do with Sergeant Gist giving away the dog in the first place rather than contacting my client and giving him the opportunity to recover his property. And then you sued for conversion, for damages, and you sued for damages for emotional distress. This was not just the replevant action, was it? Well, that's true, Your Honor. I did add those other counts. The conversion, I consider to go kind of, and I believe the case law and the text kind of consider those hand-in-hand of the replevant. They're different sides of the same coin. One is to get the goods back, and conversion is for damages for the wrongful keeping of it during that time period. Intentional infliction of emotional distress ultimately was not worth pursuing, but it was based upon really the fact that they had no legal basis to keep the dog. They were just doing it because they had an animosity toward my client, which was revealed in all of their discussions of the one time they had met him back in July of 2009. And they had formed this dislike of him, and because of that, they withheld his property and held it up, and basically held it for ransom to extort money from my client. Didn't the defendants do your client a favor? They took in his dog, which was in bad shape. They took him to the vet. They fed the dog. My August 26 letter, Your Honor, does actually, I'm sorry, my August 3 letter, thanks them for that, and offers to pay their expenses. We do recognize that from the time that the dog was in their care up until the time my client showed up, that certainly we're glad that the dog was treated well, was taken care of. Beyond that, however, they had no right to keep it, and they had no right to make these unreasonable demands of Mr. O'Keefe just to get his property back. Think of it as any other property. You find a watch or a wallet on the street. I've got your wallet, but I'm not going to give it back unless you give me 50 bucks. Well, a wallet doesn't need anything or require shelter or anything like that. Again, Your Honor, we offer to reimburse their expenses. We do recognize that that is a legitimate request. I would point out, though, that under the laws of Illinois, under the Estranged and Lost Property Act, that is expressly not something that a finder of property can insist upon. That statute, the criminal code, the theft of lost and mislaid property section of the criminal code, both of those express the policy of Illinois as if you find something, you're supposed to give it back to the owner. Now, if there's damages that you've incurred because of that, you may have your own cause of action, but that issue of expenses is not enough to keep you from doing your lawful duty of giving the property back to the true owner. Those policies are just ignored in this case. In fact, we cited at length the Estranged and Lost Property Act in both the original complaint and the amended complaint, and Mr. Reese denied the applicability of that and has never really addressed that other than to say in his response brief in this case that he doesn't think it applies to dogs. I'm not sure why, but he just completely ignored that and ignored the policy of Illinois as expressed in that statute. The only facts that the defendants have ever come forth with to support this abandonment theory are facts pertaining to neglect at best. Reading from the issue as they've addressed it in their response brief, the way they phrase the issue before this court, in the case at bar, Andrew Hagen took in a stray dog with no collar or tags that was dehydrated, substantially underweight, with protruding ribs, riddled with fleas, and in need of veterinary care. That's all they knew as of the time that Patrick O'Keefe showed up and said, this is my dog and I can prove it. And he did prove it, and they admit that he proved it. So all they knew is when he showed up, he was in the condition of a stray. How does that show abandonment, particularly in the face of this man standing there saying, that's my dog, I'd like him back. Here's my proof. Here's my registration. Here's pictures of me with the dog. Can I have him back? The mere fact that he was malnourished at best would have been evidence of abuse, but abuse does not mean abandonment. And there's a whole part of the Animal Control Act and other statutes, criminal code, that pertains to people who abuse animals, and none of those say, well, if you find an abused animal, you can declare yourself the owner of it. Did you file a motion to dismiss the counterclaim? I did not, Your Honor. Well, if it was frivolous and essentially did not state a cause of action under the law for the State of Illinois, why didn't you file a motion to dismiss when the motion dismissed with prejudice and that's the end of it then? Well, first off, in my analysis, it was not frivolous on its face because I believe, as I've said, I think Illinois law would recognize an abandonment in theory under the right factual circumstances as a... Correct. Did they plead that? I believe they did. They used the words intentionally relinquished or words to that effect. At least that's the way I read it. Leaving me with the strategy choices of figuring out I could have moved forward and then they would have been granted leave to replead and we've gone down that road, or what in my experience turns out to be generally the more expeditious and cheaper way of going is just allow that pleading to stand, ask what basis they have for making that pleading, address those issues as I can, and then bring a motion for summary judgment. And in this case, we went down the list of the witnesses that they claimed were available to prove abandonment and not one of them said anything other than things like we heard that this dog had run off before, which was before they ever met Patrick O'Keefe, before they had ever seen the dog, talking about things that had happened several years earlier. And at this point, I'm just assuming that those are true. Actually, those aren't the way they've been characterized. But let's give them the benefit of the doubt and assume that three years, two years, even two months before this dog had previously escaped. That doesn't change the fact that when the dog escaped this time, my client tracked him down all the way from Glen Arm to Girard, went down there, and asked, demanded his dog back. There's just nothing in that factual scenario. How long had the dog been gone? They'd been gone about seven weeks at that point. And you say your client tracked him down? My client had been informed by a neighbor who had been driving through Girard, a neighbor who knew his dog was missing and had been looking for him, and had asked him, is your dog still gone? My client said yes. He said, well, I saw a dog just like him chained up down at Girard Auto Sales. I wouldn't say tracked him down. It sounds like a complicated case. How can we say the trial court abused its discretion in not awarding sanctions? Well, Your Honor, I don't think this particular issue is complicated. I don't think there is any factual support, and there's nothing within the scheme of Illinois law that is guided by the Estranged and Lost Property Act and the Animal Control Act. What if the dog had been gone for a year? I would still say the dog had the microchip. Nowhere in that year, I mean, during this time period, my client was looking for the dog. But regardless, the amount of time that had passed wouldn't have changed the fact. So your client has the right to the dog, even if the dog had been raised by the other family for five years? Under the law, I believe that to be correct, Your Honor. I'm not aware of any case. I'm not aware of any statutory authority. And I'm not sure, even if we were to draw that line, where the line could possibly be drawn. Two months, two years, six years. There is nothing. It's my property. It's the same as if ten years from now, somebody finds a piece of stolen art that was taken from my house. It's still mine. And that's first-year law school, that first-year property that I recall. That you cannot lose your title to the property simply by passage of time or by intervening acts of third parties. If your client opened the gate to his yard and kicked the dog out? That would, I think, constitute an affirmative act showing an intention to relinquish. I kicked the dog out. What if your client just looked out the window and saw the dog running off and didn't do anything? Is that abandonment? I would say that would maybe depend on more circumstances than that. But I'm out of time. Thank you very much. Thank you. You'll have rebuttal. Mr. Brandenburg, please. Good morning. Good morning. May it please the Court. Counsel. First, I wanted to talk a little bit about the standard of review in this case. O'Keefe encourages this Court to apply a de novo review. The order of the trial court was a little bit odd, but I don't think that the trial court misunderstood that it was within its discretion to award sanctions in this case. In their motion for sanctions, the plaintiff at the trial court level set forth the standard, and we did not dispute that standard. So I don't think there's any question that the trial court understood that it was within its discretion to award sanctions. Why didn't you respond to the letter of August 3rd that offered to return the dog? Well, let's see, where the plaintiff offered to pay the expenses and get the dog back. That's an interesting thing about this case, and I was going to address that. On August 3rd, counsel had sent a letter to our clients demanding return of the dog. Our clients were away out of the country during that period. When they arrived on August 20th, the suit was filed. Shortly thereafter, they were served with the suit. Then on August 26th, they received another demand letter, at this time also demanding return of the dog, but saying, at this point, it's too late, we're going to seek damages against you. At this point, there's no option of turning back. Counsel, for the plaintiff, had made it clear that no matter what you do at this point, we are going to move forward and seek damages. And in that demand letter, it did say, now it's too late. At any point in time during this demand, suit being filed, did anybody pick up the phone and say, let's talk about this before we get too far down the road? From either side. I don't know that they did, but what happened... I sense from your hesitation they didn't. No, but it was clear from that letter, and it was clear from the way that this action was prosecuted, that there was no turning back at this point. It was, we are going to seek damages, even if you give the dog back. One problem with this appeal is that the appellant has not placed a complete record before this court. He's only brought out parts of what was said in the closing argument. I think maybe three things, a few things that were said in the testimony of Andrew O'Keefe. We have the complete record. Of the trial? Yes. And of the preliminary reclamation? Yes. I didn't understand. You're talking about his appendix, I think. Yes. Now, O'Keefe states there's three ways for a finder of property to obtain ownership of that property. One is through abandonment, the other is through the Animal Control Act, and then finally through the Estrays and Lost Property Act. We claimed in our counterclaim and set forth the defense to the McClellan claim in abandonment theory. Now, this was warranted by good faith argument for extension or modification of existing law. Traditionally, you have to show an intentional relinquishment of a property right in order to establish abandonment. But in this case, there were facts which warranted a good faith argument that the law could be extended to where abandonment could be inferred from the circumstances. In this case, the dog was found malnourished, dehydrated, and flea-ridden. It had no collar. There were facts presented that O'Keefe did not even microchip this animal until after it had run away one time and the Sagamon County Animal Control required that he get it microchipped. It had ran away on multiple prior occasions, and it was allowed to run free. And this was a dog that had been gone one time prior for seven weeks. O'Keefe knew that this was a dog that, if allowed to roam free, had a tendency not to return home. He also knew it was an intelligent dog that was capable of escaping and took no action to contain the dog. O'Keefe contends that Reesh somehow in the beginning should have looked at the Estrays and Lost Property Act and advised his clients that since they didn't comply with the steps within that act, they had no right to claim the dog. But that's flawed for two reasons. One, if a piece of property is abandoned, the Estrays and Lost Property Act doesn't apply. That applies to lost property. Number two, section one of the act creates an ambiguity. It lists these livestock, of which a dog is not included. And certainly these livestock, I think it could be argued, would be considered personal property. So where there's that ambiguity, I think there's a good basis to claim that there was no, that this dog had been abandoned. Finally, I'll note that there was no motion for summary judgment brought us to this claim. One would think that if this claim was frivolous, forget filing a motion to dismiss, but after all the evidence, after all the depositions, why was there no motion for summary judgment brought out as to this counterclaim of abandonment? Now, the final thing I'll address is whether or not this counterclaim was interposed to harass or delay. And I'll say that it was not. Number one, our clients certainly had an intention to claim the dog. They paid for its food. They sheltered it for a period of time. They paid for veterinary care. They could have simply said, we don't want to take this dog and have given it away. Now, some of the statements that were pointed to in the closing argument, one being, you know, we were just going to ring his bell. We never intended to keep this dog. At a point, and after that initial preliminary reclaimant hearing, at a point, this counterclaim was asserted in order to try to defeat their claim for damages. Initially, of course, our clients wanted to keep this dog or they wouldn't have gone through the preliminary reclaimant hearing. But at a point, it became a defense to this claim for exorbitant damages. And I think that that statement, if you look at it, we're going to ring his bell a little bit. If you look at it in its context, it means we're not just going to back down. We have a defense we can put forward in this case. Not that we're, and I don't think that it necessarily, that it means or was stated in a way to mean, listen, we're going to harass this guy and delay this action. It means we have a defense to this. And one that we can put forth in good faith. I really don't have anything else to say on this matter. If the court has any questions, I'd be happy to address them. But I would ask that the ruling of the trial court be affirmed.  Rebuttal, please. I'd like to address just a couple of points. Judge Appleton asked whether we'd ever tried to talk to each other. I would direct the court to my August 26, 2009 letter. It's at page A212 in the appendix and C930 in the record. As you know, though, you didn't respond to that letter. And when I tried to call you after your return from your trip overseas, you declined even to talk to me. I did try to talk, but they wouldn't talk to me. Andrew Hagen, by the way, did not accompany me. Your complaint was already on file by then, right? It was, Your Honor, because an August 3 letter was sent. I never heard anything from anyone. And there was a good reason for that? We wanted the dog back. They were gone. Oh, we had no idea. Well, but they had an excuse for not coming. And actually, Andrew Hagen, the one who claimed to become the new owner of this dog, wasn't on that trip. So he was around. How old is Andrew Hagen? I think at the time he was 18. Yeah, well, you know, my client's dog was not being returned to him. Nobody was responding to my letter. I understand that, but he's 18 years old. What do you expect? I understand, Judge. That's one of the reasons why I was directing most of these things to the parents. But when they returned, they wouldn't talk to me. You know, it was just, what else am I going to do? Sit there in a stalemate until maybe they decide to give the dog back? Mr. Brandenburg suggests that I didn't file a motion for summary judgment against the counterclaim. That is incorrect. The motion for summary judgment filed on November 22, 2010, asked for summary judgment in favor of plaintiff on the counterclaim. The judge didn't rule on that. Instead, he suggested that it be withdrawn, and that's ultimately what happened. But we did certainly address that issue in our motion for summary judgment. Mr. Brandenburg suggested that the dog ran off because my client didn't take any steps to contain the dog, and that's just factually incorrect. I want to read you a phrase from your letter of August 26th. Through no fault of his own, Mr. O'Keefe has now incurred relatively substantial legal fees just to pursue lawful relief that is unquestionably due him. For that reason, he is not inclined simply to dismiss the lawsuit against you at this time without some amount of compensation being provided. So you were not willing to just take the dog back. You wanted damages on August 26th. I think at this point it was turning into we're going to hold on to your dog as coercion, as a way of forcing you to drop any claim for damages, which are allowed by the law. I mean, that's what conversion is intended to do. Well, the question for you was why wasn't this case resolved? Why didn't you just say give us the dog back and we'll be done? And you said, oh, we did that. But you didn't do that. I did. You said damages. We want the dog plus damages. And then I called the man, and he wouldn't answer my phone call, wouldn't talk to me. Where am I at that point? Yeah, by this point the complaint had already been filed. You told us what a wonderful letter this was of August 26th when they came back. We were willing to resolve the matter. But that's not true. Your letter says give us the dog back plus damages. Page 2 of that similar, Your Honor. Even if you do not want to pay any damages without being ordered to do so, though, I would urge you to return Boomer at your earliest opportunity. That will reduce the potential damages available to Mr. O'Keefe. It will also reduce the attorney's fees you and he will incur at the reclaiming hearing on September 3. But that's still, you're talking about damages, just less. They held my client's dog. I understand that. I understand that. But what I also understand is that I don't see how anybody involved in this case can be proud of what's happened here. I agree. Both sides. Both sides. What damages did you have at the time of the letter that Justice Cook has referred to being August 26th? Well, at that point, Your Honor, we had, in order to recover something that was unquestionably the property of my client, he had incurred unnecessary legal fees. The rest of the damages are the intangible. You have my dog and I want my dog back. You have my possession. Those damages that are allowed under a... Intentional infliction of emotional distress? Well, that I would say really was created through the continual refusal to return it. But that claim was dropped. We ended up withdrawing that. Thank you very much, Your Honor. Thanks to both of you. The case is submitted. The court stands in recess until this afternoon.